ASSET PURCHASE AGREEMENT

dated as of July 24, 2009

among

**QUERCUS APSO, LLC**
as Purchaser,

and

**APPLIED SOLAR, INC.**

and

**SOLAR COMMUNITIES I, LLC,**
as Sellers

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ................................................................................................ 1

    1.1    Certain Terms Defined ......................................................................................... 1
    1.2    Interpretation .................................................................................................... 11

ARTICLE II PURCHASE AND SALE OF THE ACQUIRED ASSETS ............................ 12

    2.1    Purchase and Sale of Assets .............................................................................. 12
    2.2    Excluded Assets ................................................................................................ 14
    2.3    Assumption of Liabilities .................................................................................. 14
    2.4    Excluded Liabilities .......................................................................................... 15
    2.5    Assignment and Assumption of Contracts ........................................................ 18
    2.6    Excluded Asset Amendments............................................................................. 19

ARTICLE III CONSIDERATION ..................................................................................... 20

    3.1    Purchase Price .................................................................................................. 20
    3.2    Allocation of Purchase Price ............................................................................. 20

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS....................... 21

    4.1    Corporate Organization ..................................................................................... 21
    4.2    Authorization of Agreement............................................................................... 21
    4.3    Conflicts; Consents of Third Parties .................................................................. 21
    4.4    Title to Acquired Assets .................................................................................... 22
    4.5    Contracts........................................................................................................... 22
    4.6    Property ............................................................................................................ 22
    4.7    Intellectual Property .......................................................................................... 22
    4.8    Taxes ................................................................................................................ 23
    4.9    Employee Benefit Plans .................................................................................... 23
    4.10   Labor Matters ................................................................................................... 23
    4.11   Environmental Matters ...................................................................................... 24
    4.12   Insurance .......................................................................................................... 24
    4.13   No Brokers or Finders ....................................................................................... 24
    4.14   Litigation; Proceedings..................................................................................... 24
    4.15   Board Approval and Recommendations............................................................. 24
    4.16   Compliance with Laws...................................................................................... 25
    4.17   Customer Warranty and Maintenance Services Agreements ............................... 25
    4.18   Sufficiency of Acquired Assets.......................................................................... 25
    4.19   Warranties Are Exclusive.................................................................................. 25

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER ................. 26

    5.1    Corporate Organization ..................................................................................... 26

5.2    Authorization and Validity ............................................................................ 26
5.3    No Conflict or Violation................................................................................ 26
5.4    Consents and Approvals ............................................................................... 26
5.5    No Brokers or Finders .................................................................................. 26
5.6    Financing ..................................................................................................... 26
5.7    Legal Proceedings ....................................................................................... 27
5.8    No Other Representations and Warranties .................................................... 27

**ARTICLE VI COVENANTS AND OTHER AGREEMENTS** ........................................... 27

6.1    Pre-Closing Covenants of Sellers................................................................. 27
6.2    Pre-Closing Covenants of Purchaser ........................................................... 29
6.3    Other Covenants of Sellers and Purchaser ................................................... 30
6.4    Employment Covenants and Other Undertakings ........................................ 30
6.5    Non-Assignment of Contracts ..................................................................... 32
6.6    Casualty ....................................................................................................... 32
6.7    Name Change ............................................................................................... 32

**ARTICLE VII TAXES** ...................................................................................................... 33

7.1    Taxes Related to Purchase of Acquired Assets ............................................ 33
7.2    Waiver of Bulk Sales Laws .......................................................................... 33

**ARTICLE VIII BANKRUPTCY COURT MATTERS** ........................................................ 33

8.1    Motions........................................................................................................ 33
8.2    Assigned Contracts...................................................................................... 34
8.3    Procedure..................................................................................................... 34
8.4    Purchaser Protections .................................................................................. 34

**ARTICLE IX CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES.** 34

9.1    Conditions Precedent to Performance by Sellers ......................................... 34
9.2    Conditions Precedent to the Performance by Purchaser ............................... 35

**ARTICLE X CLOSING AND DELIVERIES** ..................................................................... 36

10.1   Closing......................................................................................................... 36
10.2   Sellers' Deliveries ....................................................................................... 37
10.3   Purchaser's Deliveries................................................................................. 37

**ARTICLE XI TERMINATION** .......................................................................................... 37

11.1   Conditions of Termination ........................................................................... 37
11.2   Effect of Termination ................................................................................... 39
11.3   Expense Reimbursement .............................................................................. 39

**ARTICLE XII MISCELLANEOUS** .................................................................................... 39

| 12.1 | Survival | 39 |
|------|----------|-----|
| 12.2 | Further Assurances | 40 |
| 12.3 | Successors and Assigns | 40 |
| 12.4 | Governing Law; Jurisdiction | 40 |
| 12.5 | Expenses | 40 |
| 12.6 | Severability | 40 |
| 12.7 | Notices | 41 |
| 12.8 | Amendments; Waivers | 42 |
| 12.9 | Entire Agreement | 42 |
| 12.10 | Seller Disclosures | 42 |
| 12.11 | Headings | 42 |
| 12.12 | Electronic Delivery; Counterparts | 42 |
| 12.13 | Waiver of Jury Trial | 43 |
| 12.14 | General Release | 43 |

| Exhibit A | Form of Assignment and Assumption Agreement |
|-----------|---------------------------------------------|
| Exhibit B | Form of Bankruptcy Sale Order |
| Exhibit C | Form of Bidding Procedures Order |
| Exhibit D | Form of Bill of Sale |

| Schedule 1.1-1 | Leased Property |
|----------------|-----------------|
| Schedule 1.1-2 | Liens for Taxes |
| Schedule 1.1-3 | Statutory Liens |
| Schedule 1.1-4 | Other Liens |
| Schedule 2.2(f) | Other Excluded Assets |
| Schedule 2.2(h) | Non-Assignable Permits |
| Schedule 2.3(f) | Other Assumed Liabilities |
| Schedule 2.3(g) | Identified A/P |
| Schedule 2.3(h) | Assumed Membrane Warranty Obligations |
| Schedule 2.3(i) | Assumed Tile Warranty Obligations |
| Schedule 2.4(a)(xxiv) | Other Excluded Liabilities |
| Schedule 2.5(a) | Assignable Contracts |
| Schedule 4.3(a) | Conflicts |
| Schedule 4.3(b) | Consents of Third Parties |
| Schedule 4.5 | Contracts |
| Schedule 4.6 | Real Property Leases |
| Schedule 4.7 | Intellectual Property |
| Schedule 4.8 | Taxes |
| Schedule 4.9 | Employee Benefit Plans |
| Schedule 4.12 | Insurance |
| Schedule 4.13 | Sellers' Brokers or Finders |
| Schedule 4.14 | Litigation; Proceedings |
| Schedule 5.5 | Purchaser's Brokers or Finders |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of July 24, 2009 (the "Execution Date"), is made among (i) Quercus APSO, LLC, a Delaware limited liability company ("Purchaser"), and (ii) Applied Solar, Inc., a Nevada corporation ("ASI"), and Solar Communities I, LLC, a Delaware limited liability company ("SCI" and collectively with ASI, "Sellers" and each a "Seller").

### RECITALS

A.       Sellers conduct the business of developing and commercializing solar technologies for residential, commercial and industrial applications and arranging financing through power purchase agreements to facilitate such applications (the "Business").

B.       On the date hereof (the "Petition Date"), Sellers intend to file voluntary petitions for relief (the "Bankruptcy Case") pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and in concert with such filing, seek the entry of an order by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") approving this Agreement and authorizing Sellers to consummate the transactions contemplated hereby and by the other transaction documents.

C.       Sellers desire to sell, transfer and assign to Purchaser, and Purchaser desires to acquire and assume from Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Acquired Assets and Assumed Liabilities as more specifically provided herein.

D.       The board of directors, managers or applicable governing body of each Seller has determined that it is advisable and in the best interests of their respective estates and the beneficiaries of such estates to consummate the transactions provided for herein pursuant to the Bidding Procedures Order and the Bankruptcy Sale Order and has approved this Agreement.

E.       The transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order after such order is entered in the Bankruptcy Case.

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Sellers and Purchaser hereby agree as follows:

### ARTICLE I
### DEFINITIONS

1.1       Certain Terms Defined. As used in this Agreement, the following terms have the following meanings:

"2093603 Ontario" means 2093603 Ontario, Inc., a corporation organized under the laws of the Province of Ontario, Canada, the outstanding shares of which, other than Class A shares, are held by ASI.

"Acquired Assets" are those assets described in Section 2.1.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or use the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Allocation Statement" has the meaning set forth in Section 3.2.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Sellers (a) accept a Qualified Bid, other than that of Purchaser, as the highest or best offer, or (b) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), including a Court-approved stand-alone plan of reorganization or refinancing, all or substantially all of the Acquired Assets (or agree to do any of the foregoing) in a transaction or series of transactions to a party or parties other than Purchaser, or seek to do any of the foregoing as set forth in this clause (b).

"Ancillary Agreement" means any agreement, document or instrument (other than this Agreement) that any Seller or Purchaser, as applicable, enters into or delivers in connection with the consummation of the transactions contemplated hereby.

"ASI" has the meaning set forth in the Preamble.

"Assignable Contract" means any Contract to which any Seller is a party that such Seller is permitted under the Bankruptcy Code to sell and assign other than an Employee Benefit Plan.

"Assigned Contracts" has the meaning set forth in Section 2.5(a).

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement in substantially the form annexed hereto as Exhibit A evidencing the assignment to and assumption by Purchaser of all rights and obligations under the Assigned Contracts.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Membrane Warranty Obligations" has the meaning set forth in Section 2.3(h).

"Assumed Tile Warranty Obligations" has the meaning set forth in Section 2.3(i).

"Assumption Notice" has the meaning set forth in Section 2.5(b).

"Auction" means the auction for the sale of Sellers' assets conducted by Sellers if, and only if, any Qualified Bid is received pursuant to the Bidding Procedures Order.

2

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Sale Order" means an order, in all material respects in the form of Exhibit B, issued by the Bankruptcy Court, which Bankruptcy Sale Order shall be acceptable to Purchaser in its sole discretion.

"Barnabus" means Barnabus Energy Inc., a corporation organized under the laws of the Province of Alberta, Canada and wholly-owned subsidiary of ASI.

"Bidding Procedures Motion" means a motion, in form and substance satisfactory to Purchaser, to approve the Bidding Procedures Order.

"Bidding Procedures Order" means an order, in all material respects in the form of Exhibit C, issued by the Bankruptcy Court that, among other things, establishes procedures for an auction process to solicit competing bids.

"Bill of Sale" means the Bill of Sale in all material respects in the form of Exhibit D conveying to Purchaser title to all of the Acquired Assets.

"Budget" means the budget provided pursuant to the DIP Credit Agreement to the Lender (as defined therein).

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Delaware are authorized by Law or other governmental action to close.

"Business Employees" means all of the employees of Sellers whose job function primarily relates to the Business.

"Cash" means all cash (including checks received prior to the Closing, whether or not deposited or cleared prior to the Closing), cash equivalents and short-term investments.

"Cash Proceeds" has the meaning set forth in Section 3.1(a)(iv).

"Casualty" has the meaning set forth in Section 6.6.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) and any Regulations promulgated thereunder.

"Claim" has the meaning ascribed by Bankruptcy Code §101(5), including all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in

3

equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"Closing" has the meaning set forth in Section 10.1.

"Closing Date" has the meaning set forth in Section 10.1.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

"Contract" means any agreement, contract, lease, sublease, purchase order, arrangement, license, commitment or other binding arrangement or understanding, whether written or oral, and any amendments, modifications or supplements thereto.

"CRE" means Connect Renewable Energy, Inc., a Nevada corporation and wholly-owned subsidiary of ASI.

"Credit Agreements" means: (a) that certain Loan and Security Agreement, dated as of May 18, 2009, by and between ASI, as borrower, and Quercus, as lender, as amended by Amendment No. 1 thereto dated as of June 11, 2009, by and between ASI, as borrower, and Quercus, as lender, as further amended by Amendment No. 2 thereto dated as of June 19, 2009, by and between ASI, as borrower, and Quercus, as lender, as further amended by Amendment No. 3 thereto dated as of July 7, 2009, by and between ASI, as borrower, and Quercus, as lender, and as further amended by Amendment No. 4 thereto dated as of July 21, 2009, by and between ASI, as borrower, and Quercus, as lender, and as the same may have been otherwise amended, supplemented, restated, or otherwise modified from time to time prior to the Petition Date; (b) that certain Loan and Security Agreement, dated as of April 29, 2008, by and between ASI, as borrower, and Quercus, as lender, as the same may have been amended, supplemented, restated, or otherwise modified from time to time prior to the Petition Date; (c) that certain Guaranty, dated as of June 19, 2009, by SCI, CRE, SRS, WaterEye and 2093603 Ontario, each as a guarantor, for the benefit of Quercus, as lender; (d) that certain Guaranty, dated as of July 7, 2009, by SCI, CRE, SRS, WaterEye and 2093603 Ontario, each as a guarantor, for the benefit of Quercus, as lender; and (e) that certain Guaranty, dated as of July 21, 2009, by SCI, CRE, SRS, WaterEye and 2093603 Ontario, each as a guarantor, for the benefit of Quercus, as lender. The term "Credit Agreements" also includes all related loan and security documents and other documents evidencing the indebtedness of ASI, SCI, CRE, WaterEye, 2093603 Ontario and SRS to Quercus.

"Credit Bid Amount" has the meaning set forth in Section 3.1(a).

"Cure Amounts" means all amounts, costs and expenses required by the Bankruptcy Court to cure all defaults under the Assigned Contracts so that they may be sold and assigned to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code.

"Designation Right Contract" has the meaning set forth in Section 2.5(b).

4

"Designation Right Period" has the meaning set forth in Section 2.5(b).

"DIP Credit Agreement" means that certain Credit Agreement of even date herewith by and among ASI, as borrower, SCI, as guarantor, and Quercus, as lender, as amended, modified or restated.

"DIP Orders" means the interim and final orders of the Bankruptcy Court approving Sellers' entry into the DIP Credit Agreement.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, Web pages, etc.), cost of pricing information, business plans, quality control records and procedures, blueprints, accounting and tax files, all files, customer files and documents (including credit information), personnel files for employees, supplier lists, records, literature and correspondence, including materials relating to Inventories, services, marketing, advertising, promotional materials, Intellectual Property, and other similar materials to the extent related to, used in, held for use in, or with respect to, the Business or the Acquired Assets in each case whether or not in electronic form, whether or not physically located on any of the Leased Properties, but excluding (i) personnel files for employees of Sellers who are not hired by Purchaser as of the Closing Date (except records necessary for Purchaser to provide COBRA coverage if required by Law) and (iii) any materials exclusively related to any Excluded Assets.

"Electronic Delivery" has the meaning set forth in Section 12.12.

"Employee Benefit Plans" means all (a) employee pension benefit plans as defined in Section 3(2) of ERISA, (b) employee welfare benefit plans as defined in Section 3(1) of ERISA, and (c) stock option, bonus, deferred compensation, retention, severance, or termination pay plans or policies or any other plans or policies providing for compensation or benefits (including any employment, severance, change in control or similar agreement or any arrangement relating to a sale of the Business), in each case, that is maintained, administered, or contributed to (or with respect to which any obligation to contribute has been undertaken) by a Seller or any ERISA Affiliate and that covers any current or former employee, director, or consultant of any Seller (or their dependents, spouses or beneficiaries).

"Encumbrances" means, to the extent not considered a Lien, any security interest, lien, collateral assignment, right of setoff, debt, obligation, liability, pledge, levy, charge, escrow, encumbrance, option, right of first refusal, restriction (whether on transfer, disposition or otherwise), third party right, right limited to any Seller (or, for the purpose of Section 12.14, Purchaser) personally, other agreement term tending to limit any right or privilege of any Seller (or, for the purpose of Section 12.14, Purchaser) under any Contract, conditional sale contract, title retention contract, mortgage, lease, deed of trust, hypothecation, indenture, security agreement, easement, license, servitude, proxy, voting trust, transfer restriction under any shareholder or similar agreement, or any other agreement, arrangement, contract, commitment,

5

understanding or obligation of any kind whatsoever, whether written or oral, or imposed by any Law, equity or otherwise.

"Environmental Laws" has the meaning set forth in Section 4.11.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business (whether or not incorporated) which is treated as a single employer with any Seller under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has he meaning set forth in Section 2.5(b).

"Excluded Environmental Liabilities" means any Liability or investigatory, corrective or remedial obligation, whenever arising or occurring, arising under Environmental Laws with respect to Sellers, the Business, the Acquired Assets or the Leased Properties (including any arising from the on-site or off-site Release, threatened Release, treatment, storage, disposal, or arrangement for disposal of Hazardous Materials) whether or not constituting a breach of any representation or warranty herein and whether or not set forth on any schedule attached hereto.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Execution Date" has the meaning set forth in the Preamble.

"Expense Reimbursement" means the documented actual, reasonable out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by Purchaser and/or its Affiliates in connection with the negotiation, documentation and implementation of this Agreement and the transactions contemplated hereby and all proceedings incident thereto up to a maximum of $350,000.00.

"Federal Rules of Bankruptcy Procedure" means the rules of bankruptcy courts promulgated by the United States Supreme Court and published as an appendix to Title 11 of the United States Code.

"FF&E" means all equipment, machinery, fixtures, furniture and other tangible property owned by Sellers (unless sold to any third party in the ordinary course of business or pursuant to order of the Bankruptcy Court with the consent of Quercus and not in violation of this Agreement) or used or useful in the operation of the Business or the Acquired Assets (including all such property that is damaged), including all attachments, appliances, fittings, lighting fixtures, signs, doors, cabinets, partitions, mantels, motors, pumps, screens, plumbing, heating, air conditioning, refrigerators, freezers, refrigerating and cooling systems, waste disposal and storing, wiring, telephones, televisions, monitors, security systems, carpets, floor coverings, wall coverings, office equipments, computers (including point-of-sale terminals and systems), registers and safes, trash containers, meters and scales, combinations, codes and keys, and any other furniture, fixtures, equipment and improvements.

"Governmental Authority" means any federal, state, local court, tribunal, governmental department, agency, board or commission, regulatory or supervisory authority, or other administrative, governmental or quasi-governmental body, subdivision or instrumentality.

"Hazardous Materials" shall mean (a) any petroleum products or byproducts, radioactive materials, friable asbestos or polychlorinated biphenyls or (b) any waste, material, or substance defined as a "hazardous substance," "hazardous material," or "hazardous waste" or "pollutant" or otherwise regulated under any applicable Environmental Law.

"Improvements" means buildings, structures, systems, facilities, easements, rights-of-way, privileges, improvements, licenses, hereditaments, appurtenances and all other rights and benefits belonging, or in any way related, to the Leased Property.

"Indebtedness" with respect to any Person means any obligation of such Person for borrowed money, and in any event shall include (a) any obligation incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the ordinary course of business, (b) the face amount of all letters of credit issued for the account of such Person, (c) obligations (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Liens or Encumbrances, (d) capitalized lease obligations, (e) all guarantees and similar obligations of such Person, (f) all accrued interest, fees and charges in respect of any indebtedness and (g) all prepayment premiums and penalties, and any other fees, expenses, indemnities and other amounts payable as a result of the prepayment or discharge of any indebtedness.

"Intellectual Property" means all rights of Sellers and their Affiliates in and to (a) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, extensions, reexaminations, provisionals, divisions, renewals, revivals, and foreign counterparts thereof and all registrations and renewals in connection therewith, (b) trademarks, service marks, trade dress, logos, trade names and corporate names and other indicia of origin and corporate branding, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) works of authorship, copyrightable works, copyrights and all applications, registrations and renewals in connection therewith, (d) mask works and all applications, registrations and renewals in connection therewith, (e) trade secrets, inventions and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, assembly, test, installation, service and inspection instructions and procedures, technical, operating and service and maintenance manuals and data, hardware reference manuals and engineering, programming, service and maintenance notes and logs), (f) Software, (g) Internet addresses, uniform resource locaters, domain names, Websites and Web pages, (h) any and all other intellectual property and proprietary rights, and (i) goodwill related to all of the foregoing, in each case to the extent used or useful in the operation of the Business or related to the Acquired Assets.

7

"Interest" means "interest" as that term is used in Bankruptcy Code Section 363(f).

"Inventories" means all tires, automotive parts, automotive accessories, packaging materials, miscellaneous consumable inventories and stores and supplies owned or held for sale by Sellers or that are otherwise included in the Acquired Assets and are permitted to be sold and transferred under applicable Law.

"Law" means any law, statute, ordinance, regulation, rule, code or rule of common law or otherwise of, or any order, judgment, injunction or decree issued, promulgated, enforced or entered by, any Governmental Authority.

"Leased Property" means all the real property leased, subleased or licensed by Sellers that is used or useful in connection with the operation of the Business, all of which is described on Schedule 1.1-1.

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes.

"Lien" has the meaning given to that term in the Bankruptcy Code.

"Material Adverse Effect" means a state of facts, event, change or effect with respect to the Business, the Acquired Assets, the Assumed Liabilities or the enforceability of any Assigned Contract that results in or could reasonably be expected to result in a material adverse effect on or change in the results of operations or condition (financial or otherwise) of Sellers, the Acquired Assets (including the Assigned Contracts) taken as a whole, or the Business, but excludes any state of facts, event, change or effect caused by events, changes or developments relating to (a) changes or conditions affecting the industries in which Sellers operate generally; and (b) changes in economic, regulatory or political conditions generally; provided, in each case, that any such change does not have a disproportionate effect on Sellers, the Acquired Assets taken as a whole, or the Business.

"Obligations" means collectively the Prepetition Obligations and the DIP Obligations as each such term is defined in the DIP Orders.

"Orders" means the Bankruptcy Sale Order and the Bidding Procedures Order.

"Organizational Amendments" has the meaning set forth in Section 6.7.

"Permits" means all certificates of occupancy or other certificates, permits, authorizations, filings, approvals and licenses used, useable or useful in the operation of the Business or the use or enjoyment or benefit of the Acquired Assets.

"Permitted Liens" means: (a) Liens for Taxes not yet due or which are being contested in good faith by appropriate proceedings, which are listed on Schedule 1.1-2; (b) statutory liens arising in the ordinary course of business that are not overdue and that do not materially affect the value or use of the affected asset, all of which are listed on Schedule 1.1-3; (c) pledges or

8

deposits in connection with workers' compensation, unemployment insurance and other social-security legislation; (d) easements, rights-of-way, restrictions and other similar encumbrances other than monetary encumbrances, judgments and monetary liens that in each case do not in any case materially detract from the value or use of the property subject thereto or materially interfere with the ordinary conduct of the business of Sellers at the property subject thereto; (e) encumbrances, pledges or other Liens pursuant to this Agreement, the Credit Agreements or the DIP Credit Agreement; and (f) Liens set forth on Schedule 1.1-4.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the Recitals.

"Proceeding" has the meaning set forth in Section 2.4(a)(ix).

"Purchaser" has the meaning set forth in the Preamble.

"Purchaser Plans" has the meaning set forth in Section 6.4(b).

"Purchase Price" has the meaning set forth in Section 3.1.

"Qualified Bid" means competing bids pre-qualified for the Auction in accordance with the Bidding Procedures Order.

"Quercus" means The Quercus Trust.

"Real Property Leases" means all of Sellers' right, title and interest in all leases, subleases, licenses, concessions and other agreements (written or oral) and all amendments, extensions, renewals, guaranties and other agreements with respect thereto, pursuant to which Sellers hold a leasehold estate in, or are granted the right to use leased real property.

"Related Person" means, with respect to any Person, all present and future directors, officers, members, managers, stockholders, employees, controlling persons, Affiliates, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

"Release" shall have the meaning set forth in CERCLA.

"Released Claims" has the meaning set forth in Section 12.14.

"Sale" means the sale of the Acquired Assets and other transactions contemplated by this Agreement.

"Sale Hearing" means the hearing to consider the entry of the Bankruptcy Sale Order.

"Schedules" has the meaning set forth in Section 6.1(c).

"SCI" has the meaning set forth in the Preamble.

9

"Seller" and "Sellers" have the meaning set forth in the Preamble.

"Sellers' Knowledge" means the actual (and not constructive or imputed) knowledge of David Field, Aidan Shields, Christopher Gopal, Chris Frank, Dalton Sprinke, David Trepeck and Alan Whiting, in each case, without duty of inquiry.

"Series B Note" means that certain Series B Convertible Note, dated September 19, 2007, issued by Open Energy Corporation, now known as Applied Solar, Inc., to Quercus in the original principal amount of $20,000,000.00, together with that certain Securities Purchase Agreement, dated as of September 19, 2007, and all of their respective related documents.

"Series B Note Obligations" means any obligation or Liability of Sellers related to the Series B Note.

"Software" means any computer program, operating system, application, system, firmware or software of any nature, point-of-entry system, peripherals, and data whether operational, active, under development or design, nonoperational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, tests scripts, user manuals and other documentation therefor, whether in machine-readable form, virtual machine-readable form, programming language, modeling language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature, and all databases necessary or appropriate in connection with the operation or use of any such computer program, operating system, application, system, firmware or software.

"SRS" means Solar Roofing Systems, Inc., a corporation organized under the laws of the Province of Ontario, Canada, the outstanding common stock of which is owned by 2093603 Ontario.

"Subsidiary" means any Person whose securities or other ownership interests having by their terms the power to elect a majority of the board of directors or other persons performing similar functions are owned or controlled, directly or indirectly, by any Seller or one or more Subsidiaries, or which is owned 50% or more, directly or indirectly, by any Seller or any of its Subsidiaries.

"Suntech Agreements" means: (a) that certain manufacturing and license agreement, entered into on December 17, 2008, by and between Open Energy Corporation, now known as Applied Solar, Inc., with Wuxi Suntech Power Co., LTD, relating to solar membrane products; (b) that certain manufacturing and license agreement entered into on November 25, 2008, by and between Open Energy Corporation, now known as Applied Solar, Inc., and Wuxi Suntech Power Co., LTD, relating to solar roof tile products; and (b) the Suntech Forbearance Agreement.

"Suntech Forbearance Agreement" means that certain Forbearance and Repayment Agreement dated September 12, 2008 by and between ASI and Suntech America, Inc.

10

"Tax" or "Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Governmental Authority, whether payable by reason of contract, assumption, transferee liability, operation of Law or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workers' compensation, customs duties, registration, documentary, value-added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Transaction Taxes" has the meaning set forth in Section 7.1.

"Transferred Employees" has the meaning set forth in Section 6.4(a).

"Trust Fund Taxes" means liabilities for sales, use, withholding, trust fund or other employment related taxes for which officers and directors may have personal liability for non-payment under applicable law.

"WARN Act" means the Worker Adjustment and Retraining Notification Act, as amended, or any similar applicable Law.

"WaterEye" means WaterEye Corporation, a Nevada corporation and wholly-owned subsidiary of ASI.

    1.2    Interpretation. When a reference is made in this Agreement to a section or article, such reference shall be to a section or article of this Agreement unless otherwise clearly indicated to the contrary.

    (a)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

    (b)    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

    (c)    The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

11

(d)    A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(e)    A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto.

(f)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(g)    Any reference in this Agreement to $ shall mean U.S. dollars.

(h)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

2.1    <u>Purchase and Sale of Assets</u>.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Purchaser, all of Sellers' right, title and interest in, to and under the Acquired Assets, free and clear of all pledges, security interests, Liens, Claims, Interests or Encumbrances (other than Permitted Liens).  Purchaser shall be entitled to assign all or a portion of its rights under this Agreement to one or more Affiliates.  "Acquired Assets" shall mean all of the, direct or indirect, right, title and interest of Sellers in and to the tangible and intangible assets, properties, rights, claims and Contracts used in, held for use in, or related to the Business (but excluding Excluded Assets) as of the Closing, including:

(a)    all Cash;

(b)    all accounts receivable, rebates, refunds and other receivables of Sellers;

(c)    all Inventories;

(d)    all deposits (including, with respect to the Acquired Assets, customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise) and prepaid charges and expenses of Sellers as they relate to the Acquired Assets;

(e)    all rights of Sellers under each Real Property Lease included within the Assigned Contracts, in each case together with Sellers' interests in and to all Improvements and

12

fixtures located on the Leased Property subject to such Real Property Lease or attached thereto, and other appurtenances thereto, and Sellers' rights in respect thereof;

    (f)    all FF&E;

    (g)    all Intellectual Property;

    (h)    all Assigned Contracts;

    (i)    all Documents;

    (j)    all Permits, unless non-assignable as a matter of Law;

    (k)    all rights under or arising out of all insurance policies relating to the Business or the Acquired Assets, unless non-assignable as a matter of Law;

    (l)    all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Sellers or with third parties, including non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the Auction;

    (m)    any rights, claims or causes of action of Sellers for claims arising out of the operation of the Business;

    (n)    all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to Sellers or to the extent affecting any Acquired Assets other than any warranties, representations and guarantees pertaining to any Excluded Assets;

    (o)    all causes of action arising under Chapter 5 of the Bankruptcy Code relating to the Business and the Acquired Assets, including (i) any actions against or otherwise involving any counterparty to any Assigned Contract, any post-Closing employees, officers or directors of the Business, including Transferred Employees, and/or any of Sellers' lenders, landlords or vendors and/or (ii) relating to the ongoing or future operations of the Business;

    (p)    all causes of action of whatever kind and nature (including, without limitation, all claims and causes of action arising under Chapter 5 of the Bankruptcy Code), whether known or unknown, of Sellers and/or Sellers' bankruptcy estates against Wuxi Suntech Power Co., LTD, Suntech America, Inc., Suntech Power Holdings Co., Ltd. and/or any of their respective Affiliates;

    (q)    all equity interests held by ASI in the following entities: CRE, WaterEye, 2093603 Ontario and Barnabus; and

    (r)    all goodwill and other intangible assets associated with the Business and the Acquired Assets, including customer and supplier lists.

13

2.2     Excluded Assets. Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers shall retain all right, title and interest to, in and under, and all obligations with respect to the Excluded Assets. For all purposes of and under this Agreement, and as the same may be amended pursuant to Section 2.5 and Section 2.6, the term "Excluded Assets" shall mean:

(a)     any asset of Sellers that otherwise would constitute an Acquired Asset but for the fact that it is conveyed, leased or otherwise disposed of, in the ordinary course of Sellers' business prior to the Closing Date not in violation of this Agreement;

(b)     the corporate books and records of internal corporate proceedings, tax records, work papers and other records that Sellers are required by Law to retain; provided, however, that copies of the foregoing items shall be provided by Sellers to Purchaser upon Purchaser's request at Purchaser's sole expense;

(c)     the rights of Sellers under this Agreement and all consideration payable or deliverable to Sellers under this Agreement, but excluding cash flows under any Assigned Contract or any net profits generated by operation of the Business on or after the Closing Date;

(d)     all rights and interests in connection with, and assets of, any Employee Benefit Plan;

(e)     the capital stock or other equity interests of any Seller;

(f)     the assets listed on Schedule 2.2(f);

(g)     all rights under or arising out of insurance policies that are non-assignable as a matter of Law;

(h)     all rights under or arising out of Permits that are non-assignable as a matter of Law and listed on Schedule 2.2(h); and

(i)     all Contracts that are not Assigned Contracts.

2.3     Assumption of Liabilities. Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge the following liabilities and obligations (the "Assumed Liabilities"):

(a)     all Cure Amounts due and owing under any Assigned Contracts;

(b)     all of Sellers' liabilities and obligations under the Assigned Contracts accruing after the Closing;

(c)     all ordinary course liabilities and obligations with respect to the Acquired Assets arising after the Petition Date to the extent (i) relating to conduct of the Business after the Petition Date through the Closing Date and (ii) set forth in the Budget;

14

(d)     all ordinary course compensation liabilities or other obligations, which are to be honored by Purchaser in the ordinary course, relating to Transferred Employees existing as of the Closing Date, including accrued vacation, other paid time-off, and accrued gross payroll liabilities and obligations, (including payroll taxes accrued and unpaid), but excluding all Liabilities and obligations (i) relating to worker's compensation claims which remain unpaid as of the Closing Date (whether reported or not), (ii) relating to the exempt or non-exempt status of any Transferred Employee, (iii) relating to litigation, including any claims for wrongful termination, any claims under Title VII of the Civil Rights Act of 1964, as amended, or similar state Law, and any whistleblower claims and/or (iv) retained by Sellers in accordance with Section 2.4 or Section 6.4(d);

(e)     all liabilities and obligations relating to amounts required to be paid by Purchaser hereunder;

(f)     those specific Liabilities and obligations of Sellers identified on Schedule 2.3(f) hereto;

(g)     pre-Petition Date accounts payable related directly to Sellers' Business (the "Identified A/P") and listed on Schedule 2.3(g), which schedule shall be updated by Sellers, subject to Purchaser's consent, at least three business days prior to the Closing; provided, however, that the aggregate amount of Identified A/P shall not exceed $235,706.42;

(h)     those specific Liabilities and obligations of Sellers pursuant to customer warranty, incentive, rebate and maintenance service agreements related to SolarSave® roofing membranes ("Assumed Membrane Warranty Obligations") identified on Schedule 2.3(h); provided, however, that the amount of Assumed Membrane Warranty Obligations shall not exceed the amounts set forth on Schedule 2.3(h);

(i)     Liabilities and obligations of Sellers pursuant to customer warranty, incentive, rebate and maintenance service agreements related to SolarSave® roofing tiles ("Assumed Tile Warranty Obligations") identified on Schedule 2.3(i); provided, however, that the aggregate amount of Assumed Tile Warranty Obligations (to be allocated by Purchaser in its sole discretion) shall not exceed $463,000.00; and

(j)     all Trust Fund Taxes relating to any obligations arising or occurring after the Petition Date through the Closing Date.

2.4     Excluded Liabilities.

(a)     Purchaser shall not assume or be liable for any Claims, Liens, Encumbrances, Interests, Liabilities or other obligations of Sellers of any nature whatsoever, whether presently in existence or arising hereafter (other than the Assumed Liabilities), including the following (collectively, the "Excluded Liabilities"):

(i)     all obligations, Claims, or Liabilities of Sellers that relate to any of the Excluded Assets (including under any Contracts related thereto) or Excluded Contracts;

15

(ii)     any amounts due or which may become due or owing under the Assigned Contracts with respect to the period prior to Closing;

(iii)     the Excluded Environmental Liabilities (regardless of whether such Liabilities are Liabilities of any Seller);

(iv)     all obligations, Claims, or Liabilities of Sellers or for which Sellers or any Affiliate of any Seller could be liable relating to Taxes (including with respect to the Acquired Assets or otherwise), including any Taxes that will arise as a result of the sale of the Acquired Assets or the assumption of the Assumed Liabilities pursuant to this Agreement and any deferred Taxes of any nature;

(v)     all obligations, Claims, or Liabilities for any legal, accounting, investment banking, brokerage or similar fees or expenses incurred by any Seller or any predecessor of any Seller in connection with, resulting from or attributable to the transactions contemplated by this Agreement or otherwise;

(vi)     all Indebtedness of any Seller, except those Obligations that may be assumed by Purchaser under Section 3.1(b);

(vii)     all obligations and Liabilities of Sellers related to the right to or issuance of any capital stock or other equity interest of any Seller, including any stock options or warrants;

(viii)     all obligations and Liabilities of Sellers resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of Sellers or ownership or lease of any properties or assets or any properties or assets previously used by Sellers or any predecessor of any Seller, or other actions, omissions, including any amounts due or which may become due or owing under the Assigned Contracts with respect to the period prior to Closing (other than the Cure Amounts);

(ix)     all obligations and Liabilities of Sellers resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of Sellers or ownership or lease of any properties or assets or any properties or assets previously used by Sellers or any predecessor of any Seller at any time, or other actions, omissions or events occurring prior to the Closing and which (i) constitute, may constitute or are alleged to constitute a tort, breach of contract or violation of any rule, regulation, treaty or other similar authority or (ii) relate to any and all Claims, disputes, demands, actions, Liabilities, damages, suits in equity or at Law, administrative, regulatory or quasi-judicial proceedings, accounts, costs, expenses, setoffs, contributions, attorneys' fees and/or causes of action of whatever kind or character ("Proceeding") against Sellers, whether past, present, future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened;

(x)     any obligation or Liability arising out of any Proceeding commenced against Sellers or any predecessor of any Seller after the Closing and arising out of, or relating to, any occurrence or event happening prior to, on or after the Closing;

16

(xi) all obligations, Claims or Liabilities (whether known or unknown) with respect to the employees or former employees, or both (or their representatives) of Sellers or any predecessor of any Seller arising prior to the Closing Date, including payroll, vacation, sick leave, worker's compensation, unemployment benefits, pension benefits, employee stock option or profit sharing plans, health care plans or benefits (including COBRA), or any other employee plans or benefits or other compensation of any kind to any employee, and obligations of any kind including any Liability pursuant to the WARN Act for any action or inaction prior to the Closing;

(xii) any obligation or Liability arising under any Employee Benefit Plan or any other employee benefit plan, policy, program, agreement or arrangement at any time maintained, sponsored or contributed to by Sellers or any ERISA Affiliate, or with respect to which Sellers or any ERISA Affiliate has any Liability;

(xiii) all accounts payable of Sellers other than Identified A/P to the extent expressly assumed by Purchaser hereunder;

(xiv) any obligation or Liability arising out of or relating to services and/or products of Sellers other than Assumed Membrane Warranty Obligations and Assumed Tile Warranty Obligations to the extent expressly assumed by Purchaser hereunder;

(xv) any obligation or Liability under any Assigned Contract which arises after the Closing but which arises out of or relates to any periods prior to the Closing;

(xvi) any obligation or Liability under any Contract, mortgage, indenture or other instrument of Sellers not expressly assumed by Purchaser hereunder;

(xvii) any obligation or Liability under any employment, collective bargaining, severance, retention or termination agreement with any employee, consultant or contractor (or their representatives) of Sellers;

(xviii) any obligation or Liability arising out of or relating to any grievance by current or former employees of Sellers, whether or not the affected employees are hired by Purchaser;

(xix) any obligation or Liability of Sellers to any shareholder or other equity holder of any Seller;

(xx) any obligation or Liability arising out of or resulting from non-compliance or alleged non-compliance with any Law, ordinance, regulation or treaty by Sellers;

(xxi) any obligation or Liability for infringement or misappropriation of any intellectual property arising out of or relating to any conduct of any Seller or operation of the Business on or before the Closing;

(xxii) any obligation or Liability of Sellers under this Agreement or any other document executed in connection herewith;

17

(xxiii) any obligation or Liability of Sellers based upon such Person's acts or omissions occurring after the Closing;

(xxiv) the Liabilities specifically identified and described on Schedule 2.4(a)(xxiv);

(xxv) any Series B Note Obligations; and

(xxvi) any other Liabilities of Sellers not expressly assumed by Purchaser pursuant to Section 2.3 above.

(b) The parties acknowledge and agree that disclosure of any obligation or Liability on any Schedule to this Agreement shall not create an Assumed Liability or other Liability of Purchaser, except where such disclosed obligation has been expressly assumed by Purchaser as an Assumed Liability in accordance with the provisions of Section 2.3 hereof.

2.5    Assignment and Assumption of Contracts.

(a) At Closing, Sellers shall, pursuant to the Bankruptcy Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents reasonably requested by Purchaser, assume and sell and assign to Purchaser (the consideration for which is included in the Purchase Price), the Assignable Contracts that are set forth on a list (identifying the name, parties and date of each such Contract) provided by Purchaser to Sellers on or before the date which is three (3) days prior to the date set for the Auction (provided that Sellers provide written notice to Purchaser of the date of the Auction at least seven (7) days prior to the date on which the Auction is to begin) (the "Assigned Contracts"); provided, however, that Purchaser shall have the right in its sole and absolute discretion to notify Sellers in writing of any Assigned Contract that it does not wish to assume immediately prior to the commencement of the Sale Hearing. Purchaser will pay all Cure Amounts in connection with such assumption and sale and assignment (as agreed to between Purchaser and Sellers or as determined by the Bankruptcy Court), and Purchaser will assume and agree to perform and discharge the Assumed Liabilities under the Assigned Contracts, pursuant to the Assignment and Assumption Agreement; provided, however, that on or before August 24, 2009, Sellers shall provide to Purchaser (i) a schedule setting forth all Cure Amounts for all Assignable Contracts and (ii) a schedule setting forth a detailed description of all such Contracts and each other Contract to which any Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets. Such schedule may be Sellers' Schedule G of their Schedules of Assets and Liabilities filed in connection with the Bankruptcy Case, it being understood that Sellers' reliance upon Schedule G does not relieve them of their obligation to provide additional information to Purchaser, at Purchaser's request, so that Purchaser may exercise its rights under this Section 2.5(a). From and after the date hereof, Sellers shall not reject any Assigned Contract unless otherwise agreed to in writing by Purchaser except for the Assignable Contracts identified in Schedule 2.5(a). Sellers shall provide timely and proper written notice of the motion seeking entry of the Bankruptcy Sale Order to all parties to Assigned Contracts and take all other actions necessary to cause such Assigned Contracts to be assumed by Sellers and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code, and Purchaser shall, at or prior to Closing, comply with all requirements under Section

18

365 necessary to assign to Purchaser the Assigned Contracts. Purchaser and Sellers agree there shall be excluded from the Acquired Assets any Assigned Contracts that are not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than any Seller, to the extent that such consent shall not have been given prior to the Closing, and the Closing shall proceed with respect to the remaining Acquired Assets without reduction to the Purchase Price, subject to Purchaser's termination right set forth in Section 11.1(c)(ix).

(b)     Purchaser shall have the right, by written notice to Sellers within ten (10) days after the Closing Date, to specify any Contracts that are not included as Assigned Contracts (each such other Contract, an "Excluded Contract") that shall be held by Sellers and not rejected pursuant to Section 365 of the Bankruptcy Code (any such Contract, a "Designation Right Contract") for the duration of the Designation Right Period, and Sellers shall have the right at any time following ten (10) days after the Closing to cause any Excluded Contract other than the Designation Right Contracts to be rejected pursuant to Section 365 of the Bankruptcy Code; it being understood and agreed that, without limiting any other obligation of Sellers hereunder, none of Sellers shall in any event reject or seek to reject any Contract during the period beginning on the date hereof and ending at the conclusion of the ten (10) day period following the Closing Date, except with Purchaser's prior written consent. As to Designation Right Contracts, Sellers shall not seek to reject such contracts for a period of 210 days following the Closing Date (the "Designation Right Period") and, as soon as practical after receiving further written notice(s) (each, an "Assumption Notice") from Purchaser during the Designation Right Period requesting assumption and assignment of any Designation Right Contract, Sellers shall, subject to Purchaser's demonstrating adequate assurance of future performance thereunder, take all actions reasonably necessary to seek to assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code any Contract(s) set forth in an Assumption Notice, and any applicable cure cost shall be satisfied in accordance with the definition of Assumed Liabilities. Sellers agree and acknowledge that the covenant set forth in this Section 2.5(b) shall survive the Closing. With respect to any Designation Right Contract or any Excluded Contract, Purchaser shall pay and be solely responsible for all costs (including Sellers' legal fees) arising from, relating to, or in connection with, the continuation by Sellers of such Designation Right Contracts or Excluded Contracts for the period during the Designation Right Period from the Closing Date up to and including the date which is ten (10) days following Sellers' receipt of written notice from Purchaser authorizing rejection of same. Notwithstanding anything in this Agreement to the contrary, on the date any Contract is assumed and assigned to Purchaser pursuant to this Section 2.5(b), such Contract shall be deemed an Assigned Contract for all purposes under this Agreement.

(c)     For the avoidance of doubt, the Assigned Contracts shall include all of the Suntech Agreements, unless Purchaser consents in writing prior to the Closing to the exclusion of any of the Suntech Agreements.

2.6     Excluded Asset Amendments. Notwithstanding anything herein to the contrary, Purchaser reserves the right to designate any Acquired Asset as an Excluded Asset at any time during the Designation Right Period.

## ARTICLE III
## CONSIDERATION

3.1     Purchase Price.

(a)     In consideration of the sale of the Business and the Acquired Assets to Purchaser, and in reliance upon the representations, warranties, covenants and agreements of Sellers set forth herein, and upon the terms and subject to the conditions hereinafter set forth, the purchase price (the "Purchase Price") for the Business and the Acquired Assets shall be:

(i)     the full amount of the Obligations (the "Credit Bid Amount") as provided in Section 3.1(b), plus

(ii)     assumption of the Assumed Liabilities, plus

(iii)     with respect to the Series B Note Obligations, the waiver of any right in the Bankruptcy Case to a distribution from the Cash Proceeds of this Sale, it being understood that all other rights and claims arising from or relating to the Series B Note Obligations are fully preserved, including, without limitation, the right to receive a distribution in respect of the Series B Note Obligations of other property in which Sellers have an interest, plus

(iv)     cash in the amount of $200,000.00 (the "Cash Proceeds").

· (b)     At the Closing, the Credit Bid Amount shall be paid by (i) delivering to Sellers fully executed releases and waivers from the applicable lenders under the DIP Credit Agreement and/or the Credit Agreements with respect to all or a part of Sellers' obligations thereunder and/or (ii) with the written consent of the applicable lenders under the DIP Credit Agreement and/or the Credit Agreements, assuming all or a part of Sellers' obligations thereunder on terms reasonably acceptable to Purchaser and providing Sellers with fully executed releases and waivers from the applicable lenders under the DIP Credit Agreement and/or the Credit Agreements with respect to all of Sellers' obligations thereunder; provided that the Credit Bid Amount is paid in whole pursuant to, in Purchaser's sole discretion, clause (i) above or clause (ii) above or a combination thereof.

3.2     Allocation of Purchase Price.

(a)     Within the earlier of (i) 120 days after the Closing Date and (ii) 20 days prior to the extended due date of the Tax Returns to which IRS Form 8594 must be attached, Purchaser shall deliver to Sellers a statement (the "Allocation Statement") allocating, for tax purposes, the consideration paid by Purchaser for the Acquired Assets among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder.

(b)     The parties to this Agreement hereby agree to (i) be bound by the Allocation Statement, (ii) act in accordance with the Allocation Statement in connection with the preparation, filing and audit of any Tax Return (including in the filing of IRS Form 8594 and any corresponding other Tax forms) and (iii) take no position inconsistent with the Allocation Statement for any Tax purpose (including in any audit, judicial or administrative proceeding).

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby represent and warrant to Purchaser as of the date hereof and as of the Closing Date:

4.1     Corporate Organization.  Each Seller is duly organized, validly existing and in good standing under the Laws of its state of incorporation or formation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its business is currently being conducted.  Except as a result of the commencement of the Bankruptcy Case, each Seller is qualified to do business and is in good standing in all jurisdictions where it leases real property in connection with the operation of the Business or otherwise conducts the Business.

4.2     Authorization of Agreement.  Subject to entry of the Bankruptcy Sale Order and authorization as is required by the Bankruptcy Court:

(a)     Each Seller has, or at the time of execution will have, all necessary power and authority to execute and deliver this Agreement and each Ancillary Agreement to which such Seller is or will become a party and to perform its obligations hereunder and thereunder;

(b)     the execution, delivery and performance of this Agreement and each Ancillary Agreement to which a Seller is or will become a party and the consummation of the transactions contemplated hereby and thereby have been, or at the time of execution will be, duly authorized by all necessary action on the part of such Seller and no other proceedings (shareholder, member or otherwise) on the part of Sellers are necessary to authorize such execution, delivery and performance; and

(c)     this Agreement and each Ancillary Agreement to which a Seller is or will become a party have been, or when executed will be, duly and validly executed and delivered by such Seller and (assuming the due authorization, execution and delivery by the other parties hereto or thereto) this Agreement and each Ancillary Agreement to which a Seller is or will become a party constitutes, or will constitute, when executed and delivered, the valid and binding obligation of such Seller enforceable against such Seller in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity).

4.3     Conflicts; Consents of Third Parties.

(a)     Except as set forth on Schedule 4.3(a), the execution, delivery and performance by each Seller of this Agreement and each Ancillary Agreement, the consummation of the transaction contemplated hereby and thereby, or compliance by each Seller with any of the provisions hereof or thereof do not, or will not at the time of execution, result in the creation of any Lien or Encumbrance upon the Acquired Assets and do not, or will not at the time of execution, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration or cancellation under any provisions of:

(i) such Seller's certificate of incorporation, bylaws or comparable organizational documents;

(ii) subject to entry of the Bankruptcy Sale Order, any Assigned Contract or Permit to which such Seller is a party or by which any of the Acquired Assets are bound;

(iii) subject to entry of the Bankruptcy Sale Order, any order, writ, injunction, judgment or decree of any Governmental Authority applicable to such Seller or any of the Permits, licenses, rights, properties or assets of such Seller as of the date hereof; or

(iv) subject to entry of the Bankruptcy Sale Order, any applicable Law.

(b) Subject to entry of the Bankruptcy Sale Order, except as set forth on Schedule 4.3(b), no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Seller in connection with the execution, delivery and performance of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which it is or will become a party, the compliance by such Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the assignment or conveyance of the Acquired Assets.

4.4 Title to Acquired Assets. Sellers have good, valid, marketable and undivided title to the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances, other than Permitted Liens, and Purchaser will be vested, to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, with good, valid, marketable and undivided title to the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances, other than Permitted Liens.

4.5 Contracts. Schedule 4.5 sets forth a complete list, as of the date hereof, of all material Contracts to which any Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets, copies of which have been provided to Purchaser. Purchaser has received true and complete copies of such Contracts and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement.

4.6 Property. Sellers do not own any real property. Schedule 4.6 sets forth the title and parties to, and date of, each of the Real Property Leases, and the address of each Leased Property and a true and complete list of all Real Property Leases. Purchaser has received true and complete copies of the Real Property Leases and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement relating to the Leased Property.

4.7 Intellectual Property. Except as set forth on Schedule 4.7, (i) with respect to any Intellectual Property owned by any Seller (as opposed to Intellectual Property of which any Seller is a licensee), Sellers have all right, title and interest to all Intellectual Property, without any conflict known to any Seller with the rights of others, (ii) no Person other than Sellers has the right to use the Intellectual Property owned by Sellers, and (iii) Sellers have the valid right to

22

use, pursuant to a license, sublicense or other agreement, any Intellectual Property used in Sellers' Business that is owned by a party other than Sellers.

4.8  Taxes.

(a)  Except as set forth on Schedule 4.8, each Seller has filed all material Tax Returns that it was required to file. All such Tax Returns were correct and complete in all material respects. All material Taxes owed by any Seller (whether or not shown on any Tax Return) have been paid. No Seller is the beneficiary of any extension of time within which to file any Tax Return. With respect to each Seller, no claim has ever been made by a Governmental Authority in a jurisdiction where such Seller does not file Tax Returns that such Seller is or may be subject to taxation by that jurisdiction.

(b)  Each Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party, and all Forms W-2 and 1099 (or any other applicable form) required with respect thereto have been properly completed and timely filed.

(c)  There is no dispute or claim concerning any Tax Liability of any Seller claimed or raised by any authority in writing or, to Sellers' Knowledge, orally. No Seller has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

4.9  Employee Benefit Plans. Schedule 4.9 sets forth a list of each Employee Benefit Plan. No Seller or any ERISA Affiliate has maintained, sponsored, or contributed to an Employee Benefit Plan that is subject to Title IV of ERISA within the last six years or, in any way, directly or indirectly, has any liability with respect to such a plan. All Employee Benefit Plans are being administered in compliance, in all material respects, with, where applicable, ERISA and the Code, and the regulations promulgated thereunder. Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter upon which Sellers may rely, or has pending or has time remaining in which to file an application for such determination from the United States Internal Revenue Service.

4.10  Labor Matters.

(a)  No Seller is a party to any collective bargaining agreement or has any relationship with any labor organization. There is no labor strike, slowdown, work stoppage or other material labor dispute relating to Sellers pending or, to Sellers' Knowledge, threatened against any Seller. No union organizing or decertification efforts are underway or, to Sellers' Knowledge, threatened, and no other question concerning representation exists.

(b)  No Seller has received notice of any material employment-related charge or material complaint against any Seller before the Equal Employment Opportunity Commission, the Department of Labor, the National Labor Relations Board or any other Governmental Authority and no Seller has received any notice of any material threatened employment-related charge or complaint against any Seller by any such Governmental Authority.

23

(c)    With respect to this transaction, any notice required under any Law or collective bargaining agreement has been given, and all bargaining obligations with any employee representative have been, or prior to the Closing will be, satisfied. No Seller has implemented, or will implement, other than in connection with the Closing, any mass layoff of employees that could implicate the WARN Act or similar state, local or foreign Laws or Regulations.

4.11    Environmental Matters.  (a) The Acquired Assets are in material compliance with all applicable Laws, regulations, or other legal requirements relating to the protection of the environment or human health and safety as it relates to Hazardous Materials ("Environmental Laws"); (b) no Seller has received written notice of any Proceeding relating to or arising under Environmental Laws with respect to the Acquired Assets or the Business, nor, to Sellers' Knowledge, are any of the same being threatened in writing against any Seller or any real property owned, operated, or leased by any Seller; (c) no Seller has received any written notice of, or entered into, any obligation, order, settlement, judgment, injunction, or decree involving outstanding requirements relating to or arising under Environmental Laws; and (d) there has been no Release of any Hazardous Material into the environment at, onto, or from any property owned or leased by any Seller which would reasonably be expected to result in material Liability, costs or Claims relating to any Environmental Law.

4.12    Insurance.  Sellers maintain the insurance policies set forth on Schedule 4.12, which Schedule sets forth all insurance policies covering the property, assets, employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage). Such policies are in full force and effect and except as set forth on Schedule 4.12, will continue in full force and effect immediately following the Closing. Sellers have paid all premiums on such policies due and payable prior to the Execution Date. Sellers have not done anything by way of action or inaction that invalidates any such policies in whole or in part.

4.13    No Brokers or Finders.  No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, any of Sellers in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement, other than as set forth on Schedule 4.13, the fees and expenses of which Sellers shall bear, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transaction.

4.14    Litigation; Proceedings.  Except as set forth on Schedule 4.14, there is no material claim, action, suit, Proceeding, complaint, charge, hearing, grievance or arbitration pending or, to Sellers' Knowledge, threatened against or related to the Business, whether at Law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor are there any investigations relating to the Business, pending or, to Sellers' Knowledge, threatened by or before any arbitrator or any Governmental Authority. None of the Acquired Assets is subject to any judgment, injunction, order, consent, or decree of any Governmental Authority or any settlement agreement with any Person.

4.15    Board Approval and Recommendations.  The board of directors, managers or applicable governing body of each Seller has determined that, based upon its consideration of the

24

alternatives deemed reasonably available to each Seller by the governing body of such Seller, and subject to the approval of the Bankruptcy Court and the provisions in this Agreement regarding the solicitation of and ability to accept Alternate Transactions, a sale, assignment and assumption of the Acquired Assets and the Assumed Liabilities pursuant to this Agreement under Sections 105, 363 and 365 of the Bankruptcy Code is in the best interests of such Seller in light of such Seller's present circumstances and available resources.Compliance with Laws. Each Seller (i) has complied with, is in compliance with and has operated the Business in compliance with all applicable Laws in all material respects, and (ii) holds all material Permits, concessions, grants, licenses, easements, variances, exemptions, consents, orders, franchises, authorizations and approvals of all Governmental Authorities necessary for the lawful conduct of the Business and is in compliance with all of the foregoing in all material respects. No Seller has received any written notice or other written communication from any Governmental Authority or other Person (i) asserting any violation of, or failure to comply with, any requirement of any Permit or (ii) notifying a Seller of the non-renewal, revocation or withdrawal of any Permit. Each Seller is in material compliance with the terms of the Permits.

4.17    Customer Warranty and Maintenance Services Agreements.    To Sellers' Knowledge, as of the Petition Date, (i) the amount of pending claims, actions or suits of the parties set forth on Schedule 2.3(h) against Sellers and/or their Affiliates related to SolarSave® roofing membranes does not exceed the amounts set forth on Schedule 2.3(h) with respect to each such party and (ii) (A) the amount of pending claims, actions or suits of the parties set forth on Part A of Schedule 2.3(i) against Sellers and/or their Affiliates related to SolarSave® roofing tiles does not exceed the amounts set forth on Part A of Schedule 2.3(i) with respect to each such party and (B) the aggregate amount, based on a good faith estimate by Sellers, to provide for warranty replacement of SolarSave® roofing tiles sold by Sellers or their Affiliates at an assumed failure rate of three percent (3%) does not exceed the amounts set forth on Part B of Schedule 2.3(i).

4.18    Sufficiency of Acquired Assets.  Except for any Contracts or Intellectual Property relating to the Business that Purchaser expressly elects not to assume pursuant to this Agreement and subject to Purchaser employing a sufficient number of Business Employees, the properties and assets of Sellers comprising the Acquired Assets are sufficient for the continued conduct of the Business immediately following Closing in substantially the same manner as now being conducted by Sellers.

4.19    Warranties Are Exclusive.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THEIR ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR OPERATIONS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.    PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT PURCHASER IS PURCHASING THE ACQUIRED ASSETS ON AN "AS IS, WHERE IS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

25

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers as follows:

5.1     Corporate Organization. Purchaser is a Delaware limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted.

5.2     Authorization and Validity. Purchaser has, or at the time of execution will have, all necessary limited liability company power and authority to execute and deliver this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and the performance of Purchaser's obligations hereunder and thereunder have been, or at the time of execution will be, duly authorized by all necessary action by Purchaser. This Agreement and each Ancillary Agreement to which Purchaser is or will become a party have been, or at the time of execution will be, duly executed by Purchaser and constitute, or will constitute, when executed and delivered, Purchaser's valid and binding obligations, enforceable against it in accordance with their respective terms except as may be limited by bankruptcy or other Laws affecting creditors' rights and by equitable principles.

5.3     No Conflict or Violation. The execution, delivery and performance by Purchaser of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party do not or will not at the time of execution (a) violate or conflict with any provision of the organizational documents of Purchaser, (b) violate any provision of applicable Law, or any order, writ, injunction, judgment or decree of any court or Governmental Authority applicable to Purchaser, or (c) violate or result in a breach of or constitute (with due notice or lapse of time, or both) an event of default or default under any Contract to which Purchaser is party or by which Purchaser is bound or to which any of Purchaser's properties or assets are subject.Consents and Approvals. No consent, waiver, authorization or approval of any Person and no declaration to or filing or registration with any Governmental Authority is required in connection with the execution and delivery by Purchaser of this Agreement and each Ancillary Agreement to which Purchaser are or will become a party or the performance by Purchaser of its obligations hereunder or thereunder.

5.5     No Brokers or Finders. No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Purchaser in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement, other than as set forth on Schedule 5.5, the fees and expenses of which Purchaser shall bear, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transaction.

5.6     Financing. Purchaser has adequate financing from internally-generated sources and has adequate cash on hand, or will obtain adequate financing on or prior to the Closing Date, and will continue to have adequate financing on the Closing Date, to enable it to fulfill its

26

obligations under this Agreement and the transactions contemplated hereby. Purchaser acknowledges and agrees that its obligations under this Agreement are not contingent on obtaining adequate financing.

5.7    Legal Proceedings. As of the Effective Date, no Proceeding is pending or, to Purchaser's knowledge, threatened against Purchaser that could prevent Purchaser from entering into, or performing its obligations under this Agreement or otherwise consummating the transactions contemplated hereby in full.

5.8    No Other Representations and Warranties. Except for the representations and warranties contained in this Article 5, neither Purchaser nor any other Person makes any other express or implied representation or warranty on behalf of Purchaser.

## ARTICLE VI
## COVENANTS AND OTHER AGREEMENTS

6.1    Pre-Closing Covenants of Sellers. Sellers covenant to Purchaser that, during the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

(a)    Cooperation. Sellers shall use commercially reasonable efforts to obtain, and assist Purchaser in obtaining, at no cost to Purchaser (other than Cure Amounts payable at or after the Closing), such consents, waivers or approvals of any third party or Governmental Authority required for the consummation of the transactions contemplated hereby, including the sale and assignment of the Acquired Assets. Sellers shall take, or cause to be taken, all commercially reasonable actions and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby.

(b)    Access to Records and Properties. Sellers shall (i) provide Purchaser and its Related Persons reasonable access upon reasonable notice to the facilities, offices and personnel of Sellers and to the books and records of Sellers, related to the Business or the Acquired Assets or otherwise reasonably requested by Purchaser if reasonably necessary to comply with the terms of this Agreement or the Ancillary Agreements or any applicable Law, including access to perform field examinations and inspections of inventories, facilities and equipment of the Business; (ii) furnish Purchaser with such financial and operating data and other information with respect to the condition (financial or otherwise), businesses, assets, properties or operations of Sellers as Purchaser shall reasonably request; and (iii) permit Purchaser to make such reasonable inspections and copies thereof as Purchaser may require; provided, however, that Purchaser shall use commercially reasonable efforts to prevent any such inspection from unreasonably interfering with the operation of the Business or the duties of any employee of Sellers; provided, further, that nothing herein shall constitute a waiver of Sellers' rights to seek an order of the Bankruptcy Court authorizing Sellers to abandon, destroy or otherwise dispose of any Excluded Assets in Sellers' bankruptcy estates after providing prior written notice thereof to Purchaser as set forth in Section 12.7.

27

(c)   Disclosure Schedules and Supplements. Sellers shall notify Purchaser of, and shall supplement or amend the disclosure schedules (the "Schedules") to this Agreement with respect to, any matter that (i) arises after the Execution Date and that, if existing or occurring at or prior to such delivery of the Schedules, would have been required to be set forth or described in the Schedules to this Agreement or (ii) makes it necessary to correct any information in the Schedules to this Agreement or in any representation and warranty of Sellers that has been rendered inaccurate thereby. Each such notification and supplementation, to the extent known, shall be made no later than five (5) Business Days after discovery thereof and no later than three (3) days before the date set for the Closing by the parties. No such supplement or amendment to the Schedules to this Agreement shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement.

(d)   Conduct of Business Prior to Closing. Except as expressly contemplated by this Agreement or with Purchaser's prior written consent (which consent may be withheld for any reason or no reason at all), and except to the extent expressly required under the DIP Credit Agreement, the Bankruptcy Code, other applicable Law or any ruling or order of the Bankruptcy Court:

(i) .   Sellers shall not take any action that would constitute or result in an Event of Default (as defined therein) under the DIP Credit Agreement;

(ii)   Sellers shall not directly or indirectly sell or otherwise transfer, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer, any of the Acquired Assets other than the sale of Inventory in the ordinary course of business or the use of cash collateral in accordance with the DIP Credit Agreement or the DIP Orders;

(iii)   Sellers shall not permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, Claim, Interest or Encumbrance, except for Permitted Liens and Liens granted in connection with the DIP Credit Agreement;

(iv)   Sellers shall not enter into any transaction or take any other action that could be reasonably expected to cause or constitute a breach of any representation or warranty made by Sellers in this Agreement;

(v)   Sellers shall notify Purchaser promptly in writing of any Material Adverse Effect;

(vi)   Sellers shall not make any promise or representation, oral or written, or otherwise, (1) to increase the annual level of compensation payable or to become payable by Sellers to any of their directors or Business Employees, (2) to grant, or establish or modify any targets, goals, pools or similar provisions in respect of, any bonus, benefit or other direct or indirect compensation to or for any director or Business Employee, or increase the coverage or benefits available under any (or create any new) Employee Benefit Plan, or (3) to enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which any Seller is a party or involving a director or Business Employee of Sellers, except, in each case, as required by Law, or as required

28

by any plans, programs or agreements existing on the Execution Date and disclosed on Schedule 4.9;

(vii)    Sellers shall comply in all material respects with all Laws applicable to them or having jurisdiction over the Business or any Acquired Asset;

(viii)   Sellers shall not enter into any Contract material to Sellers (taken as a whole) to which any Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets or assume, amend, modify or terminate any Contract to which any Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets (including any Assigned Contract);

(ix)     Sellers shall not cancel or compromise any material debt or claim or waive or release any material right of Sellers that constitutes an Acquired Asset;

(x)      Sellers shall not enter into any commitment for capital expenditures except as set forth in the Budget;

(xi)     Sellers shall not terminate, amend or modify in any manner any lease for Leased Property;

(xii)    Sellers shall use commercially reasonable efforts to (1) conduct the Business in substantially the same manner as conducted as of the date of this Agreement and only in the ordinary course, (2) preserve the existing business organization and management of the Business intact, (3) keep available the services of the current officers and employees of the Business, to the extent reasonably feasible, (4) maintain the existing relations with customers, distributors, suppliers, creditors, business partners, employees and others having business dealings with the Business, to the extent reasonably feasible, and (5) refrain from changing in any material respect any of their product prices or pricing policies (e.g., discount policies) for any of their products except as shall be necessary to meet competition or customer requirements;

(xiii)   Sellers shall at all times maintain, preserve and protect all of their material Intellectual Property, and preserve all the remainder of their material property, in use or useful in the conduct of the Business and keep the same in good repair, working order and condition (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices, so that the business carried on in connection therewith may be properly and advantageously conducted at all times; and

(xiv)    Sellers shall not take, or agree, commit or offer (in writing or otherwise) to take, any actions in violation of the foregoing.

6.2    Pre-Closing Covenants of Purchaser.  Purchaser covenants to Sellers that, during the period from the Execution Date through and including the Closing or the earlier termination of this Agreement:

(a)     Cooperation.  Purchaser shall take, or cause to be taken, all commercially reasonable actions and to do, or cause to be done, all things necessary or proper, consistent with

applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby; provided, that the foregoing shall not require Purchaser to participate in the Auction.

(b) Adequate Assurances Regarding Assigned Contracts and Required Orders. With respect to each Assigned Contract, Purchaser shall provide adequate assurance of the future performance of such Assigned Contract by Purchaser. Purchaser shall take such actions as may be reasonably requested by Sellers to assist Sellers in obtaining the Bankruptcy Court's entry of the Bankruptcy Sale Order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

(c) Sufficient Funds. Purchaser shall ensure that, on the Closing Date, Purchaser will have sufficient funds to pay Cure Amounts respecting the Assigned Contracts and all of its fees and expenses incurred in connection with the transactions contemplated hereby.

(d) Permits. Purchaser shall use commercially reasonable efforts to cooperate with Sellers to obtain or consummate the transfer to Purchaser of any Permit required to own or operate the Acquired Assets under applicable Laws.

6.3  Other Covenants of Sellers and Purchaser.

(a) Personally Identifiable Information. Purchaser shall honor and observe, in connection with the transactions contemplated by this Agreement, any and all policies of Sellers in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(l)(A) of the Bankruptcy Code.

(b) Access to Records after Closing. Following Closing, Purchaser and Sellers agree to permit their respective representatives to have access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business operations, to the books and records acquired pursuant to this Agreement so as to enable Purchaser and Sellers to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to prosecute and defend legal actions or for other like purposes. If either party desires to dispose of any such records, such party shall, prior to such disposition, provide the other party with a reasonable opportunity to remove such of the records to be disposed of at the removing party's expense.

6.4  Employment Covenants and Other Undertakings.

(a) Employees. Purchaser shall have the right, but not the obligation, to employ or engage as contractors any or all of the Business Employees as Purchaser determines in its sole and absolute discretion. The terms of employment offered to any Business Employees (including compensation and benefits) shall be determined by Purchaser in its sole and absolute discretion. Any Business Employees actually employed by Purchaser are referred to herein as "Transferred Employees." Purchaser shall deliver a list of the Business Employees it intends to hire no later than five (5) days prior to the hearing to approve the Bankruptcy Sale Order. Immediately prior to the Closing, the employment of all of the Transferred Employees shall be terminated by the applicable Seller. Sellers shall deliver to Purchaser on or before the Closing

30

Date all personnel files and employment records relating to the Transferred Employees (including completed I-9 forms and attachments with respect to all Transferred Employees, except for such employees as Sellers certify in writing are exempt from such requirement).

(b) <u>Purchaser Employee Benefit Plans</u>. At Closing, Purchaser shall make available or establish one or more employee benefit plans for the Transferred Employees and their dependents. Purchaser shall credit (i) each Transferred Employee with his or her service with Sellers, to the same extent such service would have been credited had such service been with Purchaser, and (ii) the Transferred Employees with all service recognized by Sellers under employee plans as service with Purchaser for purposes of eligibility to participate and vesting under all employee benefit plans, programs and policies of Purchaser, whether now existing or hereafter adopted (the "<u>Purchaser Plans</u>"). The Purchaser shall waive any coverage waiting period, pre-existing condition and actively-at-work requirements that have been satisfied under corresponding plans of Sellers and shall provide that any eligible expenses incurred before the Closing Date by a Transferred Employee (and his or her dependents) during the calendar year of the Closing and disclosed to Purchaser by such Transferred Employee shall be taken into account for purposes of satisfying the applicable deductible, coinsurance and maximum out-of-pocket provisions, and applicable annual and/or lifetime maximum benefit limitations of Purchaser Plans. Nothing in this <u>Section 6.4</u> or any other provision of this Agreement shall be construed to modify, amend, or establish any benefit plan, program or arrangement or in any way affect the ability of the parties hereto or any other Person to modify, amend or terminate any of its benefit plans, programs or arrangements.

(c) <u>Sellers Employee Benefit Plans</u>. Sellers shall retain (i) all Liabilities and obligations in respect of their past, present and future employees under applicable Laws and (ii) all Liabilities and obligations under any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or program maintained or contributed to by a Seller or any ERISA Affiliate, including any Employee Benefit Plans, and Purchaser shall have no Liability or obligation whatsoever under the Employee Benefit Plans nor shall Purchaser assume the sponsorship of the Employee Benefit Plans.

(d) <u>Other Obligations</u>. Except as otherwise required by Law, specified in this Agreement, or otherwise agreed in writing by Purchaser and/or its Affiliates, neither Purchaser nor its Affiliates shall be obligated to provide any severance, separation pay, or other payments or benefits, including any key employee retention payments, to any employee of Sellers on account of any termination of such employee's employment on or before the Closing Date, and such benefits (if any) shall remain obligations of Sellers.

(e) <u>Forms W-2 and W-4</u>. Sellers and Purchasers shall adopt the "standard procedure" for preparing and filing IRS Forms W-2 (Wage and Tax Statements) and Forms W-4 (Employee's Withholding Allowance Certificate) regarding the Transferred Employees. Under this procedure, Sellers shall keep on file all IRS Forms W-4 provided by the Transferred Employees for the period required by applicable law concerning record retention and Purchasers will obtain new IRS Forms W-4 with respect to each Transferred Employee.

(f) <u>No Right to Continued Employment</u>. Nothing contained in this Agreement shall confer upon any Transferred Employee any right with respect to continuance of

employment by Purchaser, nor shall anything herein interfere with the right of Purchaser to terminate the employment of any Transferred Employees at any time, with or without notice, or restrict Purchaser, in the exercise of its business judgment in modifying any of the terms or conditions of employment of the Transferred Employees after the Closing.

(g) Employee Communications. To the extent permitted by applicable Law and/or any contractual obligations of Sellers relating to the confidentiality of information concerning or relating to any Business Employee, Sellers shall, prior to making any written or oral communications to any Business Employee pertaining to compensation or benefit matters that are affected by the transactions contemplated by this Agreement, provide Purchaser with a copy of the intended communication.

6.5 Non-Assignment of Contracts. Notwithstanding anything herein to the contrary, this Agreement shall not constitute an agreement to assign any Assigned Contract or any Permit, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of any other Person party thereto, would constitute a breach thereof or in any way negatively affect the rights of Purchaser (unless the restrictions on assignment would be rendered ineffective pursuant to Sections 9-406 through 9-409, inclusive, of the Uniform Commercial Code, as amended), as the assignee of such Assigned Contract or Permit, as the case may be, thereunder. If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, such consent or approval is required but not obtained, neither Sellers nor Purchaser shall be in breach of this Agreement nor shall the Purchase Price be adjusted or the Closing delayed, provided that Sellers shall cooperate with Purchaser without further consideration, in any reasonable arrangement designed to provide Purchaser with all of the benefits of or under any such Assigned Contract or Permit, including but not limited to enforcement for the benefit of Purchaser of any and all rights of Sellers against any Person party to the Assigned Contract or Permit arising out of the breach or cancellation thereof by such Person; provided, however, that after Closing, Purchaser shall be responsible for all payment and other obligations under, and for all costs of enforcing rights under, such Assigned Contract or Permit to the same extent as if such Assigned Contract or Permit had been assigned. Any assignment to Purchaser of any Assigned Contract or Permit that shall, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained. For the avoidance of doubt, nothing in this Section 6.5, shall be deemed to alter any rights of the Purchaser under Section 11.1(c)(ix) of this Agreement.Casualty. If, between the date of this Agreement and the Closing, any of the Acquired Assets shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause ("Casualty"), then Purchaser shall have the option to: (a) acquire such Acquired Assets on an "as is" basis and take an assignment from Sellers of all insurance proceeds payable to Sellers in respect of the Casualty, or (b) in the event that the Casualty has a Material Adverse Effect, terminate this Agreement and the transactions contemplated hereby.

6.7 Name Change. At Closing, Sellers will deliver to Purchaser a duly and properly authorized and executed evidence (in form and substance satisfactory to Purchaser) as to the amendment of such Sellers' organizational documents (collectively, the "Organizational Amendments") changing each Seller's name to another name which does not include the words "Applied Solar", "Open Energy", "Solar", "Energy" or any of the names set forth on the

signature pages to this Agreement. Upon the Closing, each Seller hereby irrevocably authorizes Purchaser to file the Organizational Amendments with the applicable Secretary of State of each Seller's jurisdiction of formation and in each State in which each such Seller is qualified to do business on each such Seller's behalf. Furthermore, after the Closing, each Seller shall discontinue the use of its current name (and any other trade names currently utilized by any of Sellers) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Applied Solar", "Open Energy", "Solar", "Energy" without the prior written consent of Purchaser; provided, that, during the 180-day period following the Closing Date, a Seller may use the words "(formerly Applied Solar, Inc.)" or "(formerly Solar Communities I, LLC)", as applicable, in connection with use of its new corporate name. Except as provided in the immediately preceding sentence, from and after the Closing, each of Sellers covenants and agrees not to use or otherwise employ any of the trade names, corporate names, dba's or similar Intellectual Property rights utilized by any of Sellers in the conduct of the Business, which rights shall be included in the Acquired Assets purchased hereunder.

## ARTICLE VII
## TAXES

7.1     Taxes Related to Purchase of Acquired Assets.  All Taxes, including all state and local Taxes in connection with the transfer of the Acquired Assets, and all recording and filing fees (collectively, "Transaction Taxes"), that are imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets shall be borne by Purchaser. Purchaser and Sellers shall cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, (b) provide all requisite exemption certificates, and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

7.2     Waiver of Bulk Sales Laws.  To the greatest extent permitted by applicable Law, Purchaser and Sellers hereby waive compliance by Purchaser and Sellers with the terms of any bulk sales or similar Laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement. Purchaser shall indemnify Sellers from and hold Sellers harmless from and against any Liabilities, damages, costs and expenses (including reasonable attorneys' fees) resulting from or arising out of (i) the parties' failure to comply with any such bulk sales Laws in respect of the transactions contemplated by this Agreement or (ii) any action brought or levy made as a result thereof. The Bankruptcy Sale Order shall exempt Sellers and Purchaser from compliance with any such Laws.

## ARTICLE VIII
## BANKRUPTCY COURT MATTERS

8.1     Motions.  Sellers shall file with the Bankruptcy Court, within one (1) Business Day after the later of the execution and delivery of this Agreement or the commencement of the Bankruptcy Case, a motion or motions (the "Motion") seeking the Bankruptcy Court's approval of the Bidding Procedures Order and the Bankruptcy Sale Order. Sellers shall affix a true and complete copy of this Agreement to the Motion filed with the Bankruptcy Court. The Motion shall request, among other things, (i) the scheduling of the date for the Auction to be commenced no later than October 8, 2009, and the Sale Hearing not more than one (1) Business Day

33

following the completion of the Auction, (ii) the entry of the Bidding Procedures Order in all material respects on the terms set forth in Exhibit C and (iii) the entry of the Bankruptcy Sale Order in all material respects on the terms set forth in Exhibit B.

8.2    Assigned Contracts. Sellers shall serve on all counterparties to those Contracts which may be designated as Assigned Contracts pursuant to Section 2.5 a notice specifically stating that Sellers are or may be seeking the assumption and assignment of the Assigned Contracts and shall notify such parties of the deadline for objecting to the Cure Amounts, which deadline shall not be less than five days prior to the Auction. In cases in which Sellers are unable to establish that a default exists, the relevant Cure Amount shall be set at $0.00. The Motion shall reflect Purchaser's agreement to perform from and after the Closing under the Assigned Contracts, which, subject to Court approval shall be the only adequate assurance of future performance necessary to satisfy the requirements of Section 365 of the Bankruptcy Code in respect of the assignment to Purchaser of such Assigned Contracts.

8.3    Procedure. To the extent practicable under the circumstances, Sellers shall provide Purchaser with drafts of any and all pleadings and proposed orders to be filed or submitted in connection with this Agreement for Purchaser's prior review and comment and shall to the extent that such comments relate to the Acquired Assets cooperate with Purchaser to make reasonable changes. Sellers agree to diligently prosecute the entry of the Bankruptcy Sale Order. In the event the entry of the Bankruptcy Sale Order shall be appealed, Sellers and Purchaser shall use their respective reasonable efforts to defend such appeal. Notwithstanding the foregoing, any resulting changes to this Agreement or any Ancillary Agreement or any resulting changes to the Orders shall be subject to Purchaser's approval in its sole discretion.

8.4    Purchaser Protections. Sellers shall pay to Purchaser the Expense Reimbursement pursuant to the terms and conditions set forth in Section 11.3 hereof.

## ARTICLE IX
## CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES

9.1    Conditions Precedent to Performance by Sellers. The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 9.1(c) and Section 9.1(d)) may be waived by Sellers, in their sole discretion:

(a)    Representations and Warranties of Purchaser. The representations and warranties of Purchaser made in this Agreement that are qualified by a materiality standard, in each case, shall be true and correct in all respects on and as of the Closing Date, and the representations and warranties of Purchaser made in this Agreement that are not qualified by a materiality standard, in each case, shall be true and correct in all material respects on and as of the Closing Date.

(b)    Performance of the Obligations of Purchaser. Purchaser shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which it is party that are to be performed by it on or before the Closing Date

34

(except with respect to any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement).

(c)     Bankruptcy Court Approval. The Bankruptcy Sale Order shall have been entered and shall not be subject to a stay.

(d)     No Violation of Orders. No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)     Bidding Procedures Order. The Bidding Procedures Order shall have been entered in the Bankruptcy Case.

(f)     Assumption, Sale and Assignment of Contracts. Subject to Section 6.5, the Assignable Contracts designated hereunder as Assigned Contracts shall be so assumed, sold and assigned to Purchaser by order of the Bankruptcy Court.

For avoidance of doubt, there shall be no conditions precedent to Sellers' obligation to consummate the transactions contemplated by this Agreement, except for those conditions precedent specifically set forth in this Section 9.1.

9.2     Conditions Precedent to the Performance by Purchaser. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 9.2(c) and Section 9.2(d), except as expressly provided therein) may be waived by Purchaser, in its sole discretion:

(a)     Representations and Warranties of Sellers. The representations and warranties of Sellers made in this Agreement that are qualified by a materiality standard, in each case, shall be true and correct in all respects on and as of the Closing Date, and the representations and warranties of Purchaser made in this Agreement that are not qualified by a materiality standard, in each case, shall be true and correct in all material respects on and as of the Closing Date.

(b)     Performance of the Obligations of Sellers. Sellers shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which each of them is party that are to be performed by them on or before the Closing Date (except with respect to any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement).

(c)     Bankruptcy Court Approval. The Bankruptcy Sale Order shall have been entered and shall not be subject to a stay and the Bankruptcy Court shall have provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement. The Bankruptcy Sale Order shall have become a final and nonappealable order, unless this condition has been waived in writing by Purchaser in its sole discretion.

(d)     <u>No Violation of Orders</u>. No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)     <u>Credit Bid Approval</u>. The Bankruptcy Court shall have entered an order, binding on all parties in interest in the Bankruptcy Case (which order may be the Bankruptcy Sale Order) unconditionally allowing, authorizing and approving the credit bid by Purchaser contemplated by this Agreement pursuant to Section 363(k) of the Bankruptcy Code of (i) a Claim by Purchaser in the Bankruptcy Case in an amount equal to the Obligations and (ii) a Claim by Purchaser in the Bankruptcy Case in an aggregate amount equal to the Expense Reimbursement.

(f)     <u>Bidding Procedures Motion</u>. The Bidding Procedures Motion in form and substance acceptable to Purchaser in its sole discretion shall have been filed in the Bankruptcy Case.

(g)     <u>Bidding Procedures Order</u>. The Bidding Procedures Order in form and substance acceptable to Purchaser in its sole discretion shall have been entered in the Bankruptcy Case.

(h)     <u>Material Adverse Effect</u>. There shall not have occurred a Material Adverse Effect.

(i)     <u>Assumption, Sale and Assignment of Contracts</u>. Subject to <u>Section 6.5</u>, the Assignable Contracts designated hereunder as Assigned Contracts, including the Suntech Agreements, shall be so assumed, sold and assigned to Purchaser by order of the Bankruptcy Court in form and substance reasonably satisfactory to Purchaser.

For avoidance of doubt, there shall be no conditions precedent to Purchaser's obligation to consummate the transactions contemplated by this Agreement, except for those conditions precedent specifically set forth in this <u>Section 9.2</u>.

**ARTICLE X**
**CLOSING AND DELIVERIES**

10.1     <u>Closing</u>. The consummation and effectuation of the transactions contemplated hereby pursuant to the terms and conditions of this Agreement (the "<u>Closing</u>") shall be held two (2) Business Days after the date that all conditions to the parties' obligations to consummate the transactions contemplated herein have been satisfied (the "<u>Closing Date</u>") (except for closing conditions that by their terms can only be satisfied on the Closing Date) or, if applicable, waived by the appropriate party or parties, at 10:00 a.m., local time, in the at the offices of Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 18th Floor, Wilmington, Delaware 19801, or on such other date or at such other place and time as may be mutually agreed to in writing by the parties. All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

10.2   Sellers' Deliveries. At the Closing:

(a)   the sale, transfer, assignment, conveyance and delivery by Sellers of the Acquired Assets to Purchaser shall be effected by the execution and delivery by Sellers of (i) the Bill of Sale, (ii) the Assignment and Assumption Agreement, and (iii) such other Ancillary Agreements (including special or limited warranty deeds, additional bills of sale, endorsements, assignments and other instruments of transfer and conveyance) as requested by Purchaser in form and substance reasonably satisfactory to Purchaser;

(b)   Sellers shall deliver all keys to the Leased Property that are included in the Acquired Assets, combinations to any safes thereon and passwords for all computers thereon and any security devices therein;

(c)   Sellers shall deliver an officer's certificate, duly executed by an officer of Sellers, certifying the matters set forth in Section 9.2(a) and Section 9.2(b), in form and substance satisfactory to Purchaser;

(d)   Each Seller shall deliver a non-foreign affidavit dated as of the Closing Date in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the Code so that Purchaser is exempt from withholding any portion of the Purchase Price;

(e)   Sellers shall deliver possession of the Acquired Assets;

(f)   Sellers shall deliver duly and properly authorized and executed Organizational Amendments; and

(g)   Sellers shall deliver a certified copy of the Bankruptcy Sale Order.

10.3   Purchaser's Deliveries. At the Closing,

(a)   Purchaser shall credit the Purchase Price against the Obligations and shall deliver the Cash Proceeds to or for the account of Sellers;

(b)   Purchaser shall execute and deliver to Sellers the Assignment and Assumption Agreement; and

(c)   Purchaser shall execute and deliver to Sellers such other instruments of assignment and assumption of Assigned Contracts reasonably satisfactory in form and substance to Sellers.

## ARTICLE XI
## TERMINATION

11.1   Conditions of Termination. This Agreement may be terminated only in accordance with this Section 11.1, this Agreement may be terminated at any time before the Closing as follows:

(a)   by mutual written consent of Sellers and Purchaser;

(b)     automatically and without any action or notice by either Sellers to Purchaser, or Purchaser to Sellers, immediately upon:

(i)     the issuance of a final and nonappealable order, decree, or ruling or any other action by a Governmental Authority to restrain, enjoin or otherwise prohibit the transfer of the Acquired Assets contemplated hereby;

(ii)     approval by the Bankruptcy Court of an Alternate Transaction;

(iii)     acceptance by Sellers of an Alternate Transaction; or

(iv)     Purchaser is not declared the winning bidder upon completion of the Auction.

(c)     by Purchaser:

(i)     if the Bidding Procedures Order shall not have been entered by August 10, 2009, unless agreed to in writing by Purchaser;

(ii)     if the Auction has not concluded by October 8, 2009, unless agreed to in writing by Purchaser;

(iii)     if the Bankruptcy Court has not entered the Bankruptcy Sale Order by October 13, 2009 (or such later date as Purchaser may have designated in writing to Sellers);

(iv)     if there has been a material violation or breach by any Seller of any material representation, warranty or covenant contained in this Agreement which (x) has rendered the satisfaction of any condition to the obligations of Purchaser impossible or is not curable or, if curable, has not been cured within five (5) Business Days following receipt by Sellers of written notice of such breach from Purchaser, and (y) has not been waived by Purchaser;

(v)     at any time after October 17, 2009, if the Closing shall not have occurred and such failure to close is not caused by or the result of Purchaser's breach of this Agreement;

(vi)     if, prior to the Closing Date, Sellers' Bankruptcy Case shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers is appointed in the Bankruptcy Case;

(vii)     if the Purchaser's obligations under the DIP Credit Agreement are terminated;

(viii)     if either of the interim or final order authorizing and approving the DIP Credit Agreement has not been entered within the time periods set forth therein, unless agreed to in writing by Purchaser; or

38

(ix)     if there shall be excluded from the Acquired Assets any Assigned Contract that is not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Sellers, to the extent that such consent shall not have been given prior to the Closing and such Assigned Contract shall, in the opinion of Purchaser in its absolute discretion, prevent them from effectively operating the Business;

(x)     if Sellers disclose, or Purchaser otherwise discovers, the existence of a Material Adverse Effect; or

(xi)     if Purchaser so elect in writing pursuant to Section 6.6 hereof.

(d)     by Sellers, if there has been a material violation or breach by Purchaser of any agreement or any representation or warranty contained in this Agreement which (i) has rendered the satisfaction of any condition to the obligations of Sellers impossible or is not curable or, if curable, has not been cured within five (5) Business Days following receipt by Purchaser of written notice of such breach from Sellers, and (ii) has not been waived by Sellers.

11.2     Effect of Termination.  In the event of termination pursuant to Section 11.1, this Agreement shall become null and void and have no effect and neither party shall have any Liability to the other (other than those provisions of Section 6.6, Article 11 and Article 12 that expressly survive termination or obligations to be performed on or after the Closing), except that Purchaser or Sellers shall be liable to the other party for any damages suffered by such party on account of any prior material or willful breach hereof by Purchaser or Sellers, as applicable.

11.3     Expense Reimbursement.

(a)     If this Agreement is terminated pursuant to Section 11.1(b) or Section 11.1(c), then Purchaser shall be deemed to have earned the Expense Reimbursement. The Expense Reimbursement shall be paid in cash, without further order of the Bankruptcy Court, immediately following Sellers receipt of notice of termination pursuant to Section 11.1(b) or Section 11.1(c).

(b)     The Expense Reimbursement shall be a super-priority administrative expense priority obligation under Section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, subject to any super-priority claims of Sellers' post-petition lenders.

(c)     Sellers hereby acknowledge that the obligation to pay the Expense Reimbursement (to the extent due hereunder) shall survive the termination of this Agreement, and shall have super-priority administrative status against Sellers and their respective estates.

## ARTICLE XII
## MISCELLANEOUS

12.1     Survival.  No representations, warranties, covenants and agreements of Sellers and Purchaser made in this Agreement shall survive the Closing Date except where, and only to the extent that, the terms of any such covenant or agreement expressly provide for obligations extending after the Closing.

12.2 **Further Assurances.** At the request and the sole expense of the requesting party, Purchaser or Sellers, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Purchaser or Sellers, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.

12.3 **Successors and Assigns.**

(a) Purchaser shall have the right to assign to an Affiliate any of its rights or obligations in whole or in part (including the right to acquire any of the Acquired Assets). In the event of any assignment pursuant to this Section 12.3(a), Purchaser shall not be relieved of any Liability or obligation hereunder.

(b) Purchaser shall have the right to assign this Agreement or any of its rights or obligations hereunder as collateral to any lender of Purchaser, and Sellers will sign a consent with respect thereto if so requested by Purchaser or its lender; provided, however, that no such assignment shall relieve Purchaser of its obligations to Sellers hereunder.

(c) Sellers shall not assign this Agreement or any of their rights or obligations hereunder and any such assignment shall be void and of no effect. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto, including any trustee appointed in any of the Bankruptcy Case or subsequent Chapter 7 cases and Sellers, if the Bankruptcy Case is dismissed.

12.4 **Governing Law; Jurisdiction.** This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law. For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction in Delaware.

12.5 **Expenses.** Except as otherwise provided in this Agreement, each of the parties shall pay their own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal and accounting fees and commissions or finder's fees, whether or not the transactions contemplated hereby are consummated. Purchaser shall pay the cost of all surveys, title insurance policies and title reports ordered by Purchaser.**Severability.** In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable and the application of any provision so substituted, the remaining terms shall provide for the consummation of the

40

transactions contemplated hereby in substantially the same manner as originally set forth at the later of (a) the Execution Date and (b) the date this Agreement was last amended.

12.7 <u>Notices</u>.

(a) All notices, requests, demands, consents and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service addressed to the party to whom notice is to be given, if served via Federal Express or similar overnight courier or Express Mail service; (iii) on the date sent by facsimile, with confirmation of transmission, if sent during normal business hours of the recipient, if not, then on the next Business Day; or (iv) on the third day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Sellers:
c/o Applied Solar, Inc.
3560 Dunhill Street
San Diego, California 92121
Attn: Dalton Sprinkle, Esq.
Fax: (858) 909-4099

with copy to (which shall not constitute notice):

Cross & Simon, LLC
913 North Market Street, 11th Floor
Wilmington, Delaware 19801
Attn: Christopher P. Simon, Esq.
Fax: (302) 777-4224

If to Purchaser:
Quercus APSO, LLC
1835 Newport Boulevard
A109 - PMB 467
Costa Mesa, California 92627
Attn: David Gelbaum
Fax: (949) 631-2325

with copy to (which shall not constitute notice):

The Law Offices of Joseph P. Bartlett, P.C.
1900 Avenue of the Stars, 19th Floor
Los Angeles, California 90067
Attn: Joseph P. Bartlett, Esq.
Fax: (310) 388-1055

and

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 18th Floor

Wilmington, Delaware 19801
Attn: David L. Hamilton and Gregory W. Werkheiser
Fax: (302) 658-3989

(b)     Any party may change its address or facsimile number for the purpose of this Section 12.7 by giving the other parties written notice of its new address in the manner set forth above.

12.8     Amendments; Waivers.  This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by Purchaser and Sellers, or in the case of a waiver, by the party waiving compliance.   Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

12.9     Entire Agreement.  This Agreement and the other Ancillary Agreements contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions.

12.10     Seller Disclosures.  After notice to and consultation with Purchaser, Sellers shall be entitled to disclose, if required by applicable Law or by order of the Bankruptcy Court, this Agreement and all information provided by Purchaser in connection herewith to the Bankruptcy Court, the United States Trustee, parties in interest in Sellers' Chapter 11 cases and other Persons bidding on assets of Sellers. Other than statements made in the Bankruptcy Court (or in pleadings filed therein) or as required by applicable law, including applicable federal and state securities laws, Sellers shall not issue (prior to, on or after the Closing) any press release or make any public statement or public communication with respect to the Agreement or transactions contemplated thereby without the prior written consent of Purchaser, which shall not be unreasonably withheld or delayed.

12.11     Headings.  The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

12.12     Electronic Delivery; Counterparts.  This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, may be executed in one or more counterparts, all of which shall constitute one and the same instrument.  Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .peg or similar attachment to electronic mail (any such delivery, an "Electronic Delivery") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute the original form of this Agreement and deliver such form to all other parties.  No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through

42

the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

12.13 Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION, ACTION, PROCEEDING, CROSS-CLAIM, OR COUNTERCLAIM IN ANY COURT (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO OR IN CONNECTION WITH (i) THIS AGREEMENT OR THE VALIDITY, PERFORMANCE, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF OR (ii) THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, AUTHORIZATION, EXECUTION, DELIVERY, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS, HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT WITHOUT A JURY.

12.14 General Release. Effective upon the Closing, each Seller, on behalf of itself and its estate, acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever (including, for the avoidance of doubt, actions for avoidance, subordination or recharacterization of any of Purchaser's pre-Petition Date Claims, Encumbrances, and Liens) against Purchaser, Quercus and any of their Related Persons, that directly or indirectly arise out of, are based upon, or in any manner are connected with (i) the pre-Petition Date agreements to which Purchaser, Quercus (or their Affiliates) and any of Sellers were parties and all transactions referred to in such agreements, or (ii) the acquisition by Purchaser of Claims and Liens in and against Sellers (jointly, the "Released Claims"). Should any Released Claims nonetheless exist, each Seller, on behalf of itself and its estate, hereby (i) releases and discharges the Purchaser, Quercus and their Related Persons from any Liability whatsoever on such Released Claims and (ii) releases, waives and discharges all such Released Claims against the Purchaser, Quercus and their Related Persons.

The Released Claims include claims of Sellers and their bankruptcy estates that Sellers do not know or suspect to exist at the time of the release, which if known, might have affected Sellers' decision to enter into the release. The Sellers and their bankruptcy estates shall be deemed to waive any and all provisions, rights and benefits conferred by any law of the United States or any state or territory of the United States, or principle of common law, which governs or limits a person's release of unknown claims. Specifically, the Sellers and their bankruptcy estates shall be deemed to relinquish, to the extent applicable, and to the full extent permitted by

43

law, the provisions, rights and benefits of Section 1542 of the California Civil Code, which states that:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR;

The Sellers and their bankruptcy estates shall further be deemed to waive any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable or equivalent to California Civil Code Section 1542.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**PURCHASER:**

QUERCUS APSO, LLC

By: _____
Name: _____
Title: _____

**SELLERS:**

APPLIED SOLAR, INC.

By: _____
Name: _____
Title: _____

SOLAR COMMUNITIES I, LLC

By: _____
Name: _____
Title: _____

2932773.14

**[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT, dated as of _____, 2009 is made by and among Applied Solar, Inc., a Nevada corporation, and Solar Communities I, LLC, a Delaware limited liability company (each, an "Assignor" and collectively, "Assignors"), and Quercus APSO, LLC, a Delaware limited liability company ("Assignee").

### RECITALS

WHEREAS, Assignee and Assignors entered into that certain Asset Purchase Agreement dated as of July 24, 2009 (the "Purchase Agreement"), pursuant to which Assignors have agreed to sell, and Assignee has agreed to purchase, the Acquired Assets; and

WHEREAS, the parties hereto desire to execute this Assignment and Assumption Agreement to further evidence the assignment from Assignors to Assignee of all of Assignors' right, title and interest in, to and under the Assigned Contracts, and Assignee's assumption of the Assumed Liabilities;

NOW, THEREFORE, in consideration of the foregoing and of the consideration set forth in the Purchase Agreement, and intending to be legally bound hereby, the parties hereto agree as follows:

1.  Terms used herein and not otherwise defined shall have the respective meanings ascribed thereto in the Purchase Agreement.

2.  Except as otherwise provided below, effective as of the date hereof (the "Effective Date"), each Assignor hereby sells, assigns, conveys and transfers to Assignee all rights, titles and interests of such Assignor in, to and under the Assigned Contracts.

3.  Effective as of the Effective Date, Assignee hereby assumes and agrees to be responsible for the payment, performance and discharge of the Assumed Liabilities and accepts the assignment of the Assigned Contracts.

4.  Upon the terms and subject to the conditions contained herein, the Assignors and Assignee agree (i) to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to effect, consummate, make effective, confirm or evidence transactions contemplated by this Assignment and Assumption Agreement, and (ii) to execute any documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the transactions contemplated by this Assignment and Assumption Agreement.

5.  This Assignment and Assumption Agreement will be binding from and after its execution upon Assignors and Assignee and their respective successors and assigns.

6.  To the extent any term, condition or provision of this Assignment and Assumption Agreement is in any way inconsistent with or in conflict with any term, condition or provision of the Purchase Agreement, the Purchase Agreement shall govern and control.

7.  This Assignment and Assumption Agreement may be executed in one or more counterparts, all of which shall constitute one and the same instrument. Any such counterpart, to the extent delivered by means of an Electronic Delivery shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

8.   This Assignment and Assumption Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware (without giving effect to the principles of conflicts of Laws thereof).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have duly executed and delivered this Assignment and Assumption Agreement as of the date first written above.

ASSIGNEE:

QUERCUS APSO, LLC

By: _____
Name:
Title:

ASSIGNORS:

APPLIED SOLAR, INC.

By: _____
Name:
Title:

SOLAR COMMUNITIES I, LLC

By: _____
Name:
Title:

3037042.2

[SIGNATURE PAGE TO ASSIGNMENT AND ASSUMPTION AGREEMENT]